

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    APR 20 2016    kc

WILLIAM W. BLEVINS
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO: |
| | * | SECTION: |
| HARRY J. MOREL, JR. | * | |
| | | |

\*     \*     \*

### FACTUAL BASIS

Had this case proceeded to trial, the Government would have presented credible testimony, documents, cellular phone records, cell site information, recorded conversations, video recordings, and other reliable evidence to prove, beyond a reasonable doubt, that **HARRY J. MOREL, JR.** obstructed justice, in violation of federal law.

The defendant, **HARRY J. MOREL, JR.** (hereinafter **MOREL**) served as the elected prosecutor of St. Charles Parish, Louisiana from on or about January 1, 1979 until May 31, 2012. Thereafter, he became an Assistant District Attorney in the Office of the District Attorney for St. Charles Parish and remained in that position until January 11, 2013. **MOREL** resided in, and his office was located in, St. Charles Parish, Louisiana, in the Eastern District of Louisiana.

As District Attorney and as an Assistant District Attorney for St. Charles Parish, Louisiana, **MOREL** was responsible for prosecuting individuals charged with criminal and traffic offenses against the State of Louisiana. As the District Attorney, the defendant had the authority and

1

discretion to, among other things, make bail recommendations, make sentence recommendations and bring dismiss, forego or reduce charges.

On March 6, 2010, an individual, who will be referred to as individual "A" was arrested for driving while intoxicated (DWI) in St. Charles Parish.   **MOREL** and Individual "A" subsequently discussed the possibility of **MOREL** dropping the charge.   Thereafter, **MOREL** visited Individual "A" at her house.   While at her house, **MOREL** engaged in inappropriate behavior with individual "A" and continued to discuss the possibility of dismissing the prosecution of Individual "A" for the DWI offense.   After **MOREL** left her residence Individual "A" reported this incident to the emergency 911 operator.

On July 1, 2010, **MOREL** placed Individual "A" on pre-trial intervention for her 2010 DWI.   However, Individual "A" never participated in or completed any of the requirements for the pre-trial intervention.   Despite not carrying out her responsibilities as required by this program, Individual "A"'s case was closed as per **MOREL'S** order on August 24, 2010.

On Monday July 4, 2011, (a federal and state holiday) **MOREL** and Individual "A" spoke on the telephone.   Individual "A" asked to speak to **MOREL** about her Lafourche Parish DWI and possibly doing a favor for her boyfriend, who had pending criminal charges against him in St. Charles Parish, but was willing to cooperate with law enforcement. **MOREL** asked Individual "A" to meet him at the courthouse to continue this discussion in person.   Her boyfriend followed Individual "A" there and took photographs of **MOREL's** and Individual "A"'s vehicles in the parking lot.   Individual "A" called her boyfriend and told him that she and **MOREL** were leaving the courthouse and going to a separate satellite office of the District Attorney's Office.   Her

boyfriend went to that building and took photographs of each of their vehicles at that location as well.

In November 2011, Individual "A" agreed to again record conversations with **MOREL** on behalf of the FBI as they undertook an investigation into her allegations against **MOREL**.

Individual "A" continued to record conversations with **MOREL** during 2012 when **MOREL** assisted her with theft charges she was facing in St. Charles Parish and offered to assist her with a new DWI charge pending in Lafourche Parish, Louisiana. Individual "A'"s last theft charge in St. Charles Parish was dismissed on March 26, 2012.

On May 29, 2012, Individual "A" met with **MOREL** again and asked about traffic tickets and her DWI in Lafourche Parish. **MOREL** told Individual "A" he was stepping down as district attorney on May 31, 2012, but he would remain an assistant district attorney. **MOREL** stepped down as district attorney on May 31, 2012 but remained at the district attorney's office as an assistant district attorney. During a recorded conversation with **MOREL** on June 21, 2012, **MOREL** arranged for a lawyer in Lafourche Parish to continue to handle Individual "A'"s DWI charge there. On June 22, 2012, Individual "A" pleaded guilty to DWI in the Louisiana 17th Judicial District Court (Lafourche Parish). She was sentenced to five months in the parish jail and to pay a fine of $750.00. However, the jail sentence was suspended and the defendant was placed on unsupervised probation for a period of one year. As part of this probation she was ordered to perform 64 hours of community service, complete an alcohol information school (which was marked satisfied that day), and refrain from other criminal conduct.

MOREL offered to help Individual "A" with her community service hours. He later told her that she would not have actually perform her community service hours but that it would appear that she had done them at the Luling-Boutte Lions Club.

On July 17, 2012, Individual "A" recorded a conversation she had with MOREL about her pending legal issues, including her community service hours in Lafourche Parish. The following conversation took place:

Individual "A": "So what do I have to do at this Lion's Club?"

MOREL: "You have to do what?"

Individual "A": "Like what do I have to do?"

MOREL: "The Lion's Club? Nothing."

During the conversation, Individual "A" told MOREL that Lafourche Parish officials told her that her community service hours in St. Charles Parish had to be performed under the supervision of the St. Charles Parish Sheriff's Office. The following exchange took place:

Individual "A": "I can ask, but it's, they, they said that it can't, it's gotta be through the Sheriff's Office."

MOREL: "No."

Individual "A": "That's what they told me."

MOREL: "No."

Individual "A": "So, and they already have people who clean the churches and stuff."

MOREL "It doesn't have to be through, all, all we need is a letter from them saying that you've done it because this is another Parish."

Individual "A": "Yeah."

**MOREL**: "And I'm, I'm handling it. The Sheriff has nothing to do with it or tell 'em."

Individual "A": "The Sheriff has nothing to do with it?"

**MOREL**: "Not our Sheriff, no."

On July 20, 2012, Individual "A" called **MOREL** as he instructed her during the July 17, 2012 meeting.   She recorded the conversation which went as follows:

**MOREL**: "Good, I talked to the guy and he's working on a letter for your uh, uh community service for part of it so, uh, hopefully we'll have something by the end of next week and have the letter done."

Individual "A": "By the end of next week, we'll have the letter done with community service?"

**MOREL**: "Yeah showing how much you've done. We're going to have to space it out so it won't look like you did it all at once, you know.

Individual "A": "Yeah, if I space it out, yeah, if I space it out it won't look like I did it all at once."

**MOREL**: "Yeah…"

On July 23, 2012, **MOREL** visited Individual "A" at her apartment.   FBI agents made both audio and video recordings of the meeting.   **MOREL** brought Individual "A" two bottles of wine.   When Individual "A" asked about the status of the letters for her community service, **MOREL** told her that he spoke to the man writing the letters and he was working on them. **MOREL** again attempted to engage in inappropriate behavior with individual "A". The conversation continued:

Individual "A": "I got a deal for you though. Let's see if we can make a deal."

MOREL: "What is it?"

Individual "A": "What's the furthest? We, we never really went, really, we never really went further than kissing and just kinda touching and feeling. What do you want from me?"

MOREL: "I don't know. I want to spend some time with you."

Individual "A": "You say that but you never – and I know you're busy – but you never.

MOREL: "Well, I think about making love to you but then, you know, it gets me nervous too. And I don't – but that's not why I'm helping you. So I just sort of back off."

Individual "A" then asked MOREL to see the community service papers.   MOREL told her he could not give her the papers all at once.   MOREL agreed to do so and then decided to leave.

On October 11, 2012, MOREL showed Individual "A" the falsified community service papers and told her what work she had purportedly done.   He called the Lafourche Parish Sheriff's Office and identified himself as an assistant district attorney and asked about how to send the papers to the sheriff's office.   MOREL then had District Attorney's office staff send the papers via facsimile and U.S. Mail to the Lafourche Parish Sheriff's Office.   MOREL and Individual "A" then had an inappropriate sexual discussion.

On October 16, 2012, Individual "A" called MOREL, who was then in Florida on vacation, and told him that one of the community service papers was missing.   MOREL called the district attorney's office and had the staff send the papers again.   He called Individual "A" to tell her this had been done.   The papers were sent again, and were intercepted and obtained by law enforcement.

6

On November 29, 2012, Individual "A" recorded a meeting with **MOREL**. She told **MOREL** that her boyfriend had been calling and asking for a camera memory card which contained photographs he had taken of **MOREL'S** and Individual "A"'s vehicles at the courthouse and satellite office back on July 4, 2011. In the recorded conversation, **MOREL** told Individual "A" to destroy the card and offered to take the card from her so he could destroy it. When Individual "A" asked **MOREL** what to tell investigators who came looking for the memory card, **MOREL** told her to tell investigators that she did not have any card. Individual "A" and **MOREL** agreed that Individual "A" would return the next day to give the card to **MOREL**. In a recorded conversation on November 30, 2012, Individual "A" met with **MOREL** at his office and gave him a copy of the card, claiming that it was the original. **MOREL** told Individual "A" that he would throw it in the garbage or hit it with a hammer. He also said he would see what was on it. **MOREL** told Individual "A" again to deny knowing anything about photographs if investigators spoke to her. As an attorney and prosecutor, **MOREL** was aware at the time of these conversations, that the memory card could be used as evidence in an official proceeding, specifically a federal grand jury, investigating any possible violation of federal criminal law by him. Specifically, on November 29, 2012, Individual "A" told **MOREL** about her boyfriend calling her from jail using a smuggled cellular telephone. Individual "A" told **MOREL** that he was asking for the memory card from the camera he used to take photographs when Individual "A" met with **MOREL** at the courthouse and "the other office" on July 4, 2011.

MOREL asked Individual "A" what she did with the memory card. Individual "A" said that her boyfriend said something about "going to the people with it or something." The recorded conversation continued as follows:

7

MOREL: "Where's the memory card?"

Individual "A": "The Feds?"

Individual "A" says she has the memory card.

MOREL: "Well, throw it-destroy it."

Individual "A": "Well, I don't know.   Should I?"

MOREL: "Sure."

Individual "A" says that her boyfriend was dragging her into this.

MOREL: "Well, you're dragging me into it with that.   You need to get rid of that."

Later, Individual "A" asks, "Well, I mean how do I get rid of it?"

MOREL: "What?   The pictures?"

Individual "A": "This is pissing me off.   Like, it's really-it's...he..."

MOREL: "Give it to me.   I'll get rid of it."

Individual "A" and **MOREL** discussed what other pictures were on there.

MOREL: "Get rid of it."

Individual "A" pointed out that the pictures were of her boyfriend's children as babies.

MOREL: "That's his problem.   [He] wants to play hardball, we gotta play hardball."

When they talked about what phone her boyfriend was using to contact her from prison, **MOREL** said, "I'll check with, I'll check and see if uh, I think there's a way you can plug your number into the computer, now if he's got a cell phone we can have them check that and see."

Later, the conversation continues:

MOREL: "Well, destroy that card."

Individual "A": "Alright, I just, I just, what if he says something and..."

8

**MOREL**: "What do you mean?   Don't worry about it."

Individual "A": "...and they come talk to me, and, I don't, I don't want to get, uh (sigh)..."

**MOREL**: "'What card?'"

Individual "A": "Wher-just tell him that, 'What card?'"

**MOREL**: "Yeah."

Individual "A": "Alright."

**MOREL**: "'I don't have any card.'"

Individual "A": "'Cause I thought, I mean it's only, there's no, there's no proof, except for what he's saying."

**MOREL**: "Well, that just has-leaves doubts.   So, get rid of it, and say, 'What card?'   Say, 'Yeah, I talked to Mr. **MOREL**. Tried to help him.' And I'll, and I'll agree.   You know. We met."

Individual "A": "Do you want me to go, do you want me to get it and bring it to you?"

**MOREL**: "[unintelligible] I trust you, you can destroy it.   Just shred it.

Individual "A": "I don't wanna get in trouble, I don't want anything to do with it."

**MOREL**: "How you? You don't what?"

Individual "A": "I don't want anything to do with it."

**MOREL**: "Well, then, get it and bring it over here we'll put it in the thing."

Later, **MOREL** said, "You shoulda got rid of it a long time ago."

Individual "A": "I know, but I didn't want you to think I'm holding this over you, I'm holding that over you, cause I'm not.   I'm not that kind of person."

**MOREL**: [unintelligible]

9

Individual "A": "People can say whatever they want about me, but I'm not that kind of person.   You've helped me so much."

MOREL: "Well, that's what concerned me before you know."

Individual "A": "What?"

MOREL: "About the, about that when he was saying on tape in jail that uh you were doing stuff and all that, remember?"

Individual "A": "Yeah, I remember, and you…"

MOREL: "I was upset about it."

Individual "A": "You were very upset, you were like don't call me…"

MOREL: "Yeah."

Later, **MOREL** took a telephone call, after the phone call, he resumed the conversation with Individual "A".

MOREL: "Yeah I-you know, I don't like hearing all this.   We got to get rid of that and put this behind us.   You can't talk to that guy."

Individual "A": "I know, I tol-that's why I come to you."

MOREL: "K, well."

Individual "A": "I'm not going to fucking talk to him. I'm not answering my phone. I'm changing my fucking number.   Something or I can block it.   I can block his number."

MOREL: "Well do that."

Individual "A": "So."

MOREL: "And give me the number I'm going to check and see what kind phone-if I can figure out what kind of phone it is."

10

Individual "A": "Alright, I'm pretty sure it's a smuggled cell phone."

MOREL: "So, whatcha gonna do with the, uh, card?   Get rid of it?"

Individual "A": "Yeah, unless you-unless you think it [unintelligible]..."

MOREL: "I mean, it doesn't really-it doesn't really say any-does anything, but, on the other hand, get rid of it then there's nothing there."

Individual "A": "I don't want to get in trouble, you, you..."

MOREL: "Huh?"

Individual "A": "I'll bring it to you."

MOREL: "Ok."

Individual "A": "You, you, just, do what-I don't care about the pictures, just do what you want with it."

MOREL: "Ok.   Bring it to me tomorrow morning."

On November 30, 2012, Individual "A" recorded a meeting with **MOREL**.   The FBI gave Individual "A" a copy of the original memory card used by her boyfriend on July 4, 2011.

During the conversation, **MOREL** explained how he would "get rid of" the memory card:

Individual "A": "Yep. So um...I don't know how you would get rid of it. It's hard."

MOREL: "Hm?"

Individual "A": "How are you going to destroy it? It's hard."

MOREL: "[unintelligible] destroy it."

Individual "A": "You can't even-I can't even break it. I tried to crack it."

MOREL: "Put it in the garbage."

Individual "A": "In the garbage?"

11

MOREL: "Yeah."

Individual "A": "Well, aren't you going to break it or something or cut it up?"

MOREL: "Well yeah. I mean I can do that.   With a hammer.   See what's on it."

Individual "A": "I just don't want to throw it in the garbage."

MOREL: "How many pictures are on it?"

Individual "A": "I don't know, like four or-or five."

MOREL: "What do they have? You just going into the office?"

Individual "A": "Yeah. He's got us at the court house and it's on-and it says 4th of July and it was closed and now he-you know, he's like, 'Hmm.'"

MOREL: "But, I mean, it's just you going into the court house? I mean, I wasn't even in it. 'You didn't go in there with me.'"

Individual "A": "[unintelligible] Yeah, it's us going in and then we're walking out and then we went to the other office."

MOREL: "Oh, ok."

Individual "A": "I just don't wanna keep it. Just get rid of it."

MOREL: "Yeah."

Individual "A": "Destroy it. [unintelligible]."

MOREL: "So, when it comes up, just don't answer it."

Individual "A": "So, if they do come talk to me, or say they do..."

MOREL: "Who?"

Individual "A": "I don't know, whoever he's talking to.   Just-I mean-what do I say? Nothing about it?   I don't know nothing?   'Cause he doesn't even-it's just..."

**MOREL**: "Just tell them, 'Yeah, you talked to me.   You tried to help him.'"

Individual "A": "Well, no, but, like, if they ask about the memory card, what if he says something about the pictures?"

**MOREL**: "'What pictures?'"

Individual "A": "Alright, that's what I tell them?   'Cause I mean...'"

**MOREL**: "Where's the camera?"

Individual "A": "It's ju-oh, he's-it's his camera.   It's with him somewhere, but you gotta have a, a special thing to look.   You gotta have have the same camera, 'cause I tried to plug it in the computer and delete the pictures, and it won't-it won't come up."

**MOREL**: "Yeah."

Individual "A": "So."

**MOREL**: "[unintelligible] just tell them you don't-you don't know anything about a camera."

Individual "A": "Which, I mean it's just his word, you know."

**MOREL**: "Yeah, I mean, it's his camera, you-you can say, 'Yeah he had-I know he had a camera.'"

Individual "A": "Alright."

**MOREL**: "And he said, well, he took a picture. 'Well, he may have.   I don't know.   I haven't seen it.'"

Individual "A": "Alright."

On January 11, 2013, **MOREL**'s office was searched with the consent of the District Attorney who replaced **MOREL**.   A package for a memory card reader was found on his desk.

13

**MOREL** was served with a Grand Jury subpoena for the memory card. On March 7, 2013, **MOREL** surrendered the memory card that he had received from Individual "A" through his attorney.

**MOREL**, on other occasions, between 2007 and 2009, has solicited sex from other individuals who were defendants or who had family members who were defendants in the St. Charles Parish criminal justice system. While soliciting sex from these individuals, **MOREL** likewise used the office of the District Attorney to provide benefits to these other individuals, including falsifying community service reports.

By pleading guilty to this count HARRY J. **MOREL, JR.** freely admits that he is guilty of Obstruction of Justice, in violation of Title 18, United States Code, Section 1512(d)(1) in that he harassed Individual "A" and attempted to prevent and dissuade Individual "A" from attending or testifying in an official proceeding, *i.e.*, the federal grand jury, concerning any of the above conduct, by telling  Individual "A" to "get rid of" and to "destroy" the evidence of a meeting they had and to deny the inappropriate nature of the meeting to law enforcement officials. Furthermore, based on Individual "A"'s representations, **HARRY J. MOREL, JR.** believed there would be a federal Grand Jury investigation, and as a result asked her to conceal information that would have likely led to her being a witness before that body.

## Limited Nature of Factual Basis

This factual basis is not intended to constitute a complete statement of all facts known by **HARRY J. MOREL, JR.,** but rather is a minimum statement of facts intended to prove the necessary factual predicate for the guilty plea. The limited purpose of this proffer is to demonstrate that there exists a sufficient legal and factual basis for **HARRY J. MOREL, JR.'s** plea of guilty to the charged offense of Obstruction of Justice listed in the Bill of Information.

RALPH CAPITELLI     3-30-16      Date

Attorney for Defendant

JAMES S. C. BAEHR     3/30/16      Date

Assistant United States Attorney

HARRY J. MOREL, JR.     3-30-16      Date

Defendant

15